MAXWELL, J.,
for the Court:
¶ 1. A chancellor in the Lauderdale County Chancery Court granted Mattie Beatrice Jenkins Killen $200 per month in separate maintenance after concluding her husband, James Donald Killen (J.D.), caused the couple to separate and then refused to support Mattie. J.D. contests this award and the denial of his request for a cruelty-based divorce. Because Mattie did not materially contribute to the separation and J.D. failed to show the marriage was revolting, we affirm the separate maintenance award and the denial of J.D.’s divorce request.
FACTS
¶ 2. J.D. and Mattie separated in May 2008, after less than ten years of marriage. Neither party offered much testimony about the early years of their marriage. The proof concerned more recent times, including the period surrounding J.D. and Mattie’s trip to a Philadelphia, Mississippi, casino.
¶ 3. While at the casino, a younger woman asked J.D. to dance, and J.D. accepted the invitation. After returning home, Mattie asked J.D. to “make love” to her, but J.D. refused Mattie’s advances. He made clear he wanted nothing to do with her and that she should pack her belongings and leave the home. He also told her he no longer wished to support her. At some point in April or May 2008, J.D. presented Mattie with a joint complaint for divorce. Mattie did not sign the complaint. But she left and moved in with her sister, while J.D. remained in the marital home.
¶ 4. Mattie later filed a motion for separate maintenance. J.D. responded by requesting a divorce on the ground of habitual cruel and inhuman treatment. J.D. claimed Mattie’s refusal to attend his brother’s funeral and her request that he not attend her aunt’s funeral evince cruelty. He also argued her embarrassment to be seen with him, her accusations of his adultery, and her derogatory comments and actions toward his daughter made the marriage revolting to him.
¶ 5. At a temporary hearing, J.D. agreed to participate in marriage counseling and testified he wanted Mattie to come home. But Mattie refused to return home until J.D. promised he would not see other women. Following this hearing, the chancellor denied Mattie’s request for separate maintenance.
¶ 6. But J.D.’s starkly different testimony at a second hearing caused the chancellor to conclude that J.D. had indeed caused Mattie to leave. The chancellor found that while J.D. did not explicitly threaten Mattie, she knew of his temper and left the marital household to avoid being subject to an outburst of anger. J.D. again testified he would take Mattie back into the home, yet he continued to pursue a divorce.
¶ 7. The chancellor found J.D. had presented insufficient evidence to justify a cruelty-based divorce. But the chancellor *872 found an award of $200 per month in separate maintenance to Mattie appropriate after concluding she left their home because of J.D.’s directives. He also based the award on J.D.’s refusal to reconcile or provide financial support to Mattie.
STANDARD OF REVIEW
¶ 8. We will affirm a chancellor’s decision if it is supported by substantial evidence unless the chancellor abused his discretion, the decision was manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard. Pool v. Pool, 989 So.2d 920, 923 (¶ 9) (Miss.Ct.App.2008) (citing Chapel v. Chapel, 876 So.2d 290, 298 (¶ 8) (Miss.2004)). We review questions of law de novo. Id. (citing Townsend v. Townsend, 859 So.2d 370, 372 (¶ 7) (Miss.2003)).
DISCUSSION
I. Habitual Cruel and Inhuman Treatment
¶ 9. J.D. first contests the chancellor’s denial of his cruelty-based divorce request. To obtain a divorce based on cruel and inhuman treatment, the party must establish the spouse’s conduct either:
(1) “endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief’[;] or (2) “is so unnatural and infamous” as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.
Hoskins v. Hoskins, 21 So.3d 705, 707 (¶ 6) (Miss.Ct.App.2009) (citing Kumar v. Kumar, 976 So.2d 957, 961 (1115) (Miss.Ct.App.2008)). The party seeking a divorce on cruelty grounds must prove the allegations by a preponderance of the evidence,[1] and some corroboration is required.[2] The chancellor found J.D.’s corroboration lacking.
¶ 10. J.D. disagrees and contends he presented sufficient evidence of Mattie’s cruelty. The chancellor considered the complained of actions and Mattie’s explanations. Mattie admittedly refused to attend J.D.’s brother’s funeral. But she claimed she did so to stay away from the attention surrounding J.D.’s other brother, Edgar Ray Killen. Edgar Ray, an admitted Klansman, had recently been convicted of three counts of manslaughter for his involvement in the 1964 killings of three civil-rights workers. He had obtained a brief release from prison to attend the funeral, and Mattie feared his attendance would draw media attention. Mattie admitted asking J.D. not to attend her aunt’s funeral based on another family member’s request.
¶ 11. Mattie’s justifications for avoiding being seen in public with J.D. centered on his problems getting along with people. According to Mattie, J.D. was prone to throw fits and argue with others, even friends. During his brother’s murder trial, J.D. knocked down a television reporter. Mattie testified J.D. once threw a tantrum and cursed at a couple vacationing with them to the point of ruining the trip. Mattie claimed she would not attend J.D.’s bluegrass music events because of an occasion when he got mad about the song selection and cut his mandolin strings. And because of her embarrassment by J.D.’s reaction to an inmate gospel choir singing at Blackwater Baptist Church, she stopped attending church services there.
*873 ¶ 12. J.D.’s daughter testified she felt uncomfortable around Mattie, but she explained the two were always pleasant to one another. Mattie denied having ill feelings toward J.D.’s daughter, though she did admit calling her a derogatory name on one occasion. Mattie claimed she made the comment to J.D. when his daughter tried to move into the home with a man Mattie believed to be a drug addict.
¶ 13. Mattie also suspected J.D. had been involved with other women. Aside from the dancing episode at the casino, J.D. on one occasion draped his arm around a younger woman at a fish camp. J.D. claimed the girl was merely an acquaintance. Mattie was also suspicious that J.D. had been involved with a woman who had accessed J.D.’s checkbook. But J.D. claimed the woman found the checks in a car he had loaned her or tried to sell her.
¶ 14. While there is some disagreement over the facts, resolutions of factual disputes are always entrusted to the sound discretion of the chancellor. Minter v. Minter, 29 So.3d 840, 850 (¶ 36) (Miss.Ct.App.2009) (citing Carter v. Carter, 735 So.2d 1109, 1114 (¶ 19) (Miss.Ct.App.1999)). We find the record supports the chancellor’s observation that though the marriage “had grown unpleasant and argumentative” to both, “it had not reached extreme proportions that would have rendered continued habitation unsafe or repugnant to a reasonable marital relationship.” Given Mattie’s explanations to J.D.’s alleged corroborating evidence and the chancellor’s resolution of the disputed facts, we cannot find he manifestly erred or abused his discretion in determining the marriage was not revolting enough to grant a cruelty-based divorce. This issue lacks merit.
II. Separate Maintenance
¶ 15. Though the chancellor rejected J.D.’s request for a divorce, he found it appropriate to award Mattie separate maintenance. “Separate maintenance is ‘court created equitable relief based upon the marital relationship.” Pool, 989 So.2d at 927 (¶20) (quoting Lynch v. Lynch, 616 So.2d 294, 296 (Miss.1993)). The purpose of an award of separate maintenance is to order the husband to “resume cohabitation with his wife or to provide for her separate maintenance.” Id. (quoting Thompson v. Thompson, 527 So.2d 617, 622 (Miss.1988)).
¶ 16. A separate maintenance award is appropriate where: (1) the separation occurred without fault by the wife, and (2) the husband willfully abandoned and refused to support the wife. Id. at (¶22) (citing Lynch, 616 So.2d at 296). The wife need not be totally blameless, but her misconduct must not have materially contributed to the separation. Id. (citing Lynch, 616 So.2d at 296).
¶ 17. J.D.’s primary argument against the separate-maintenance award rests on his assertion that Mattie left the marital residence by her own free will. According to J.D., this action coupled with her refusal to return, precludes an award of separate maintenance. In responding to this claim, we point out that J.D. admitted he had told Mattie to leave the home. He even presented her with a joint complaint for divorce. While J.D. did not explicitly threaten Mattie, the chancellor found she followed J.D.’s instructions to leave because she was aware of his outbursts. Further, Mattie’s testimony supports a finding that she is open to reconciliation. Though J.D. previously claimed he wished to resume cohabitation, his later testimony and actions clearly depict his desire for a divorce. They also illustrate he no longer wished to support Mattie. *874 Indeed, he made it clear he still wants a divorce, and he raises on appeal the denial of his divorce request.
¶ 18. An award of separate maintenance should be sufficient to maintain the wife in the same standard of living she enjoyed prior to separation, without unduly depleting the husband’s estate. Pool, 989 So.2d at 927 (¶ 20) (citing Bridges v. Bridges, 330 So.2d 260, 262 (Miss.1976)). Though J.D. does not contest the amount of the award, we find it reasonable. The chancellor set the separate maintenance at $200 per month. He noted J.D.’s limited monthly income consisting of a $424 retirement check and $1,500 in social-security benefits. The chancellor also found J.D.’s reported expenses disproportionately high compared to his fixed income. J.D. also paid Mattie’s $287 car note each month during the marriage without financial contribution from Mattie.
¶ 19. Mattie earned approximately $1,400 a month from her job as a switchboard operator. And after the separation, she moved in with her sister and paid $200 monthly for utilities and groceries.
¶ 20. We find JJD.’s admissions and actions sufficient to establish what we deem to be a reasonable award of separate maintenance.
III. Attorney’s Fees
¶ 21. The chancellor awarded Mattie $500 for her attorney’s fees. She now also seeks attorney’s fees for her appeal. We entrust the matter of fixing attorney’s fees for services rendered at trial to the sound discretion of the chancellor. Monroe v. Monroe, 745 So.2d 249, 253 (¶ 17) (Miss.1999) (citing Klumb v. Klumb, 194 So.2d 221, 225 (Miss.1967)). This court “will generally award attorney’s fees on appeal in the amount equal to one-half what was awarded in the lower court.” Pool, 989 So.2d at 929 (¶ 31); see also Lauro v. Lauro, 924 So.2d 584, 592 (¶ 33) (Miss.Ct.App.2006). J.D. does not appeal the chancellor’s award of attorney’s fees and did not respond to Mattie’s request for additional attorney’s fees for her appeal. We find Mattie’s request reasonable and award her $250 for her attorney’s fees on appeal.
¶ 22. THE JUDGMENT OF THE LAUDERDALE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ, CONCUR.

. Shavers v. Shavers, 982 So.2d 397, 403 (¶ 35) (Miss.2008).

. Anderson v. Anderson, 190 Miss. 508, 512, 200 So. 726, 727 (1941).